In The
Court of Appeals
For The
First District of Texas
_____________

NO. 01-06-00373-CR
_____________

RODERICK MARQUIS JOHNSON, Appellant

V.

THE STATE OF TEXAS, Appellee




On Appeal from the 179th District Court
Harris County, Texas
Trial Court Cause No. 983364




MEMORANDUM OPINION
            The 314th District Court of Harris County, Texas waived jurisdiction over
appellant, Roderick Marquis Johnson, who was 15 years of age at the time of the
murder that is the subject of this appeal. Appellant was thereafter indicted as an adult
for the offense of capital murder. A jury convicted appellant on the lesser charge of
felony murder and assessed punishment at life in prison, with a fine of $10,000. See
TEX. PEN. CODE ANN. §§ 12.32, 19.02(b)(3) (Vernon 2003).
           We determine (1) whether the evidence was legally or factually sufficient to
prove that appellant committed felony murder; (2) whether appellant’s motion for
mistrial, in response to a comment on appellant’s silence made during the State’s
closing argument at guilt-innocence, was properly denied; and (3) whether 
appellant’s objections to the State’s closing argument at punishment were waived. 
We affirm. 
Facts 
          Appellant and Oswald McGlorie (“Ike”) were close friends. On October 2,
1998, appellant and Melvin Johnson (“Doughboy”)


 approached Ike to ask if he
wanted to help them in a robbery that they were planning to commit with .38-caliber
and .22-caliber pistols at the Chase Bank located at Bellfort and Broadway in
Houston. Ike refused to participate. 
          Sometime after 9:00 on the same night, Calvin Joyce was working in his
driveway across from the Chase Bank when he noticed two black males walk toward
a grocery store located next to the bank. One of the two males had a light
complection, the other had a dark complection. Appellant is a light-complected
African-American, whereas Melvin Johnson was considerably darker-complected. 
Approximately 25 minutes later, Joyce heard a gunshot from the general direction of
the driveway of Chase Bank. Next, Joyce saw two men run from the vicinity of the
bank’s automatic-teller machine (“ATM”), through the drive-up teller booths, and
across a nearby bayou. Joyce saw a car parked at the ATM and approached. Inside,
he found a woman in the driver’s seat who appeared to be unconscious, at which
point he summoned a nearby police officer. 
          At about 10:40 p.m., Houston Police Department (“HPD”) Officer Milligan
responded to Joyce’s summons and found that the woman in the car appeared to have
been fatally shot in the neck from the driver’s side of her car. Although Joyce could
not give detailed descriptions of the two men whom he had seen run from the bank,
he believed that they were the same two men whom he had seen earlier and stated that
one was dark and the other was light-skinned. A subsequent investigation of the
crime scene by HPD Officer Scales revealed an ATM receipt, on the ground,
indicating that the shooting victim, Blanca Gutierrez, had made an ATM withdrawal
at 10:05 p.m. on October 2, 1998. 
 
          Between midnight and 12:30 a.m. on October 3, 1998, Leticia Farrell, a taxi
cab driver, picked up two young, black men from a location about 6 to 10 miles from
the crime scene, one of whom she described as dark, and the other of whom she
described as light-complected. Upon passing the Chase Bank, the cab driver saw
police activity and noticed the light-skinned man (appellant) ducked down in the back
seat.
          On October 4, 1998, HPD investigators received an anonymous tip through
Crime Stoppers that provided the nickname of Doughboy as a suspect in Gutierrez’s
murder. On October 7, investigators learned that Doughboy’s real name was Melvin
Johnson. On October 9, Farrell gave a statement to police and identified a
photograph of Doughboy as one of men whom she had picked up in the early morning
of October 3. Farrell also viewed a picture of appellant in a photographic spread and
told a detective that the other man in the cab looked like the picture of appellant, but
she was not sure that it was he. 
           The Harris County Medical Examiner’s Office reported that a bullet recovered
from Gutierrez’s body had caused her death. That bullet was analyzed by an HPD
firearms examiner, who stated that it was .38 caliber and that, in her opinion, it was
most likely fired from a .38 Special or a .357 Magnum handgun. On October 15,
1998, latent fingerprints were lifted from the inside of the driver’s side glass window
of Gutierrez’s car by a fingerprinting expert employed by HPD. The fingerprints
were entered into an automatic fingerprint identification system (“AFIS”) on October
25,1998, but the system failed to produce a match with any fingerprints that were
contained in HPD files at that time. 
          In April 1999, the father of a man named Jimmie Earl Patton called police to
say that he had received new information from his son regarding the murder. When 
subsequently questioned by Officer Straughter, Jimmie Earl Patton revealed that, a
couple of days after the murder, appellant had told him that he had shot a lady at the
bank, had hidden the guns involved in the crime, and had later traded at least one of
those guns with somebody. When asked who else might have knowledge of the
murder, Patton gave the name of “Ike.” 
           The investigators’ talk with Patton caused them to identify appellant as a
possible suspect in the murder. Shortly afterwards, in April 1999, HPD Officer
Straughter called appellant on the telephone to discuss the case, but appellant told
him that he did not want to talk about the incident. 
          During an interview conducted by Officer Straughter on May 10, 1999, Ike
stated that the day after the murder, appellant had told him that he thought that he had
killed a lady whom he had shot because she had not cooperated and had started to
scream and that, afterwards, they (he and Doughboy) had run into the woods and
hidden the guns. Ike also stated that appellant had told him that he and Doughboy
had left the neighborhood in a taxi. Ike confirmed that he had accompanied appellant
to retrieve a .38- and a .22-caliber weapon from the woods and that appellant had
traded them in exchange for a .380 gun owned by Alton Dickey. Ike led police to
question Leslie Lewis and Dickey by naming them as persons who had additional
information about the crime. 
          On May 13, 1999, Lewis reported to police that appellant had admitted to him
that he had accidentally shot a woman and had probably killed her when he and
Doughboy had tried to rob her at an ATM on Bellfort. Lewis also told police that
appellant had hidden the guns that they had used in the woods and had later gone to
retrieve them with Ike. Lewis said that, sometime after that, he had seen appellant
carry a .380 chrome, semiautomatic firearm. 
          Appellant was known by the nickname of “Little Red” in his neighborhood. 
Dickey knew both Ike and appellant in late 1998. Dickey identified Little Red as the
person in a photograph that police showed him on May 17, 1999. Dickey stated to
police that Little Red had traded a .38 revolver and a .22 automatic in exchange for
Dickey’s .380 gun and $20 in late 1998. Dickey stated that the .38 and .22 firearms
had been stolen by Doughboy sometime during the following month.
  
            Officer Saldivar, a fingerprinting expert, found that the prints lifted from
Gutierrez’s car had sufficient characteristics to enter them into AFIS to confirm an
identification. The AFIS system produced a match of the fingerprints from the crime
scene with appellant’s known fingerprints on May 30, 2003. The expert fingerprinted
appellant and compared those prints to the previously lifted latent fingerprints,
producing a match. Gutierrez’s sister believed that Gutierrez did not know appellant
and that there would have been no reason for appellant to have his hands on her car. 
Charges were filed on appellant on January 20, 2004. 
Legal Sufficiency of the Evidence 
          In his first issue, appellant contends that the evidence was legally insufficient
to prove that he committed felony murder because (1) there were no eyewitnesses to
the murder; (2) the only physical pieces of evidence connecting him to the crime were
his two fingerprints left on Gutierrez’s car door window, and the State failed to
establish when they were left there; (3) all but one of the witnesses recanted
statements that they had made to police investigators; (4) police interview techniques
cast doubt on a witness’s version of events; and (5) the testimony of one of the
witnesses was tainted due to an expectation of favorable treatment affecting his
incarceration in exchange for his cooperation. 
 
A.      Standard of Review 
          In a legal-sufficiency review, we view all of the evidence in the light most
favorable to the verdict and determine whether a rational trier of fact could have
found the essential elements of the crime beyond a reasonable doubt. King v. State,
29 S.W.3d 556, 562 (Tex. Crim. App. 2000). The jurors are the exclusive judges of
the facts, the credibility of the witnesses, and the weight to give their testimony. 
Margraves v. State, 34 S.W.3d 912, 919 (Tex. Crim. App. 2000). A jury is entitled
to accept one version of the facts, to reject another, and to reject any part of a
witness’s testimony. Id. “Each fact need not point directly and independently to the
guilt of the appellant, as long as the cumulative force of all the incriminating
circumstances is sufficient to support the conviction.” Hooper v. State, 214 S.W.3d
9, 13 (Tex. Crim. App. 2007).
B.      Appellant’s Challenge
          Appellant argues that the degree of credibility of witnesses and the weight of
circumstantial evidence do not support the jury’s verdict of guilt. These arguments
are contrary to the standard of review for legal sufficiency of the evidence. In a legal-sufficiency review, the evidence is viewed in the light most favorable to the verdict,
and a determination is made as to whether a rational trier of fact could have found the
essential elements of the crime beyond a reasonable doubt. King, 29 S.W.3d at 562. 
Here, appellant impermissibly seeks to have the evidence viewed in a light that is not
favorable to the jury’s verdict. Appellant does not claim that any specific essential
element of the offense of felony murder has not been proven beyond a reasonable
doubt; nor does he deny that there is some evidence, viewed in a light favorable to the
verdict, by which a rational factfinder could have reached a verdict of guilt. Whereas
appellant purports to apply a legal-sufficiency standard of review, he is actually
requesting that this Court reevaluate the case’s facts and witness credibility and
substitute its finding for that of the jury. This we cannot do.
           The extent by which the credibility of a witness is influenced by a recanted
statement, bias, or intimidation is a matter uniquely for the jury to decide. The jurors
are the exclusive judges of the facts, the credibility of the witnesses, and the weight
to be given their testimony. Margraves, 34 S.W.3d at 919. A jury is entitled to
accept one version of the facts, to reject another, and to reject any part of a witness’s
testimony. Id. In reaching a verdict of guilt, how much weight a jury gives to the
testimony of a witness, based on the credibility of the witness, is irrelevant to a legal-sufficiency review. Cathey v. State, 992 S.W.2d 460, 462–63 (Tex. Crim. App.
1999).
          Likewise, the weight to be given to physical evidence presented by the State
may not be reassessed in a legal-sufficiency review. Appellant gives several reasons
why there are alleged weaknesses in the State’s evidence and asserts that, due to the
combination of these weaknesses, the jury rationally could not have found that the
State proved that he committed felony murder. But appellant has attempted to
employ a standard of review that is more appropriate for a factual-sufficiency
analysis, one that is inconsistent with the established standard of review used to
analyze legal sufficiency. Whether appellant’s fingerprints, discovered at the scene
of the murder, were left during the time that the crime took place or some other period
of time is solely up to the jury, as the fact finder, to determine. Simply put, a legal-sufficiency review does not involve an assessment of alleged weaknesses in the
evidence by weighing favorable against non-favorable evidence. Cardenas v. State,
30 S.W.3d 384, 389 (Tex. Crim. App. 2000).
          The State presented evidence that showed appellant planned a robbery, was at
the scene of the murder, carried a weapon that fired the same caliber bullet that killed
Gutierrez, and admitted to a number of people that he had shot the woman whom
circumstances showed was Gutierrez. Given the cumulative force of these
incriminating circumstances, appellant’s contention that a rational trier of fact could
not have found that the State proved each element of felony murder beyond a
reasonable doubt is refuted.
          For these reasons, we overrule appellant’s first issue.
 Factual Sufficiency of the Evidence 
          In his second issue, appellant challenges the factual sufficiency of the evidence. 
In support, appellant makes the same five arguments that he asserted in his challenge
to the legal sufficiency of the evidence.
A.      Additional Facts
           When questioned at trial as to what appellant said regarding the robbery
attempt and murder, Ike replied that “he [appellant] didn’t say nothing really.” Ike
reiterated that the entire statement that he had made to police was true except that
Doughboy, not appellant, had shot Gutierrez. Dickey also changed his version of
events by claiming that he had been intoxicated when he had spoken with
investigators, that he had been referring to someone else named Red, and that he had
been mistaken when he had identified appellant in a photograph as the person with
whom he had traded guns. During his trial testimony, however, Dickey did not deny
that he had made the statements or that he had identified appellant to investigators,
nor did he deny having traded his .380 weapon for two guns with a man called Red
in late 1998.
          Lewis testified at trial that an officer had grabbed him by the collar, had shaken
him against the wall, and had said, “I’m tired of y’all.” Lewis remarked that officers
had stopped the tape recorder at points in their interview when they had raised their
voices at him.
          Patton was arrested for aggravated robbery on March 11, 1999 and was
incarcerated for that offense at the time that he gave his initial statement to
investigators. Patton stated at trial that his pretrial bond was reduced after that
conversation and that he sought to have the term of his incarceration reduced in
exchange for his cooperation in this case. 
B.      The Standard of Review  
          When conducting a factual-sufficiency review, we view all of the evidence in
a neutral light. Cain v. State, 958 S.W.2d 404, 408 (Tex. Crim. App. 1997). We will
set aside the verdict only if (1) the evidence is so weak that the verdict is clearly
wrong and manifestly unjust or (2) the verdict is against the great weight and
preponderance of the evidence. Johnson v. State, 23 S.W.3d 1, 11 (Tex. Crim. App.
2000). Under the first prong of Johnson, we cannot conclude that a conviction is
clearly wrong or manifestly unjust simply because, on the quantum of evidence
admitted, we would have voted to acquit had we been on the jury. Watson v. State,
204 S.W.3d 404, 417 (Tex. Crim. App. 2006). Under the second prong of Johnson,
we cannot declare that a conflict in the evidence justifies a new trial simply because
we disagree with the jury’s resolution of that conflict. Id. Before finding that the
evidence is factually insufficient to support a verdict under the second prong of
Johnson, we must be able to say, with some objective basis in the record, that the
great weight and preponderance of the evidence contradicts the jury’s verdict. Id. In
conducting a factual-sufficiency review, we must also discuss the evidence that,
according to the appellant, most undermines the jury’s verdict. Sims v. State, 99
S.W.3d 600, 603 (Tex. Crim. App. 2003). The fact finder alone determines what
weight to place on contradictory testimonial evidence because that determination
depends on the fact finder’s evaluation of credibility and demeanor. Cain, 958
S.W.2d at 408–09.
C.      The Law
          At trial, the jury found appellant guilty of the offense of felony murder
pursuant to Texas Penal Code section 19.02(b)(3). See TEX. PEN. CODE ANN. §
19.02(b)(3). A person commits felony murder if he commits or attempts to commit
a felony, other than manslaughter, and in the course of and in furtherance of the
commission or attempt, or in immediate flight from the commission or attempt, he
commits or attempts to commit an act clearly dangerous to human life that causes the
death of an individual. Id. Accordingly, to establish that appellant committed felony
murder as required by the jury charge, the State had to prove beyond a reasonable
doubt that, while in the furtherance of robbing or attempting to rob Gutierrez, or in
immediate flight therefrom, appellant committed an act clearly dangerous to human
life, specifically, by firing a firearm, which was a deadly weapon, that caused the
death of Gutierrez.
D.      Appellant’s Contentions
          1.       Lack of Eyewitness
           In his first contention, appellant asserts that the State’s evidence is insufficient
to prove that he is guilty of felony murder because the State failed to present an
eyewitness to the murder. In Richards v. State, the appellant contended that the
State’s evidence was factually insufficient, in part, because evidence was entirely
circumstantial and there were no eyewitnesses to the offense with which he was
charged. 54 S.W.3d 348, 350 (Tex. App.—Houston [1st Dist.] 2001, pet. ref’d). 
Despite the lack of eyewitnesses to the felony offense in Richards, the evidence was
found to be factually sufficient due to the nature of the evidence presented in the case,
coupled with the circumstances surrounding it. Id.  
          Although no eyewitness testified to having seen appellant shoot and kill
Gutierrez, Joyce heard a gunshot and saw two men run from the scene of the crime
immediately after having heard the shot. Joyce testified that he believed that the men
were African-American and that one man had a light complection, whereas the other
man had a dark complection. 
 
          Additionally, Farrell testified that, shortly after the murder, she picked up two
men near the crime scene who matched the descriptions of appellant and his alleged
accomplice, and stated that the lighter-complected man (appellant) ducked down as
they drove past the crime scene. Farrell identified a photograph of appellant’s
accomplice and told police that the photograph of the other man resembled appellant.
          The degree of incrimination that the jury could derive from testimony given by
Joyce and Farrell is compounded by the fact that appellant’s fingerprints were found
on Gutierrez’s car window at the scene of the murder. By viewing all the evidence
in a neutral light, the jury rationally could have determined from the accounts given
by Joyce and Farrell that appellant and his accomplice were present at the location
where the murder took place; one of them fired a gun; they fled from the location
where Gutierrez was discovered immediately afterward; and appellant made a gesture
that reflected consciousness of guilt. 
          2.       Inconclusiveness of Fingerprint Evidence
          In his second argument, appellant contends that the only physical evidence that
connects him to the crime are his two fingerprints and that, because investigators
could not say when the impressions were left, the State failed to prove his culpability.
          In this case, police investigators matched appellant’s fingerprints with those
lifted from inside the driver’s side window of the car in which Gutierrez was
murdered. Gutierrez’s sister claimed that Gutierrez did not know appellant and that
there was no reason for appellant’s fingerprints to have appeared on Gutierrez’s car. 
         Additionally, by claiming that the fingerprints are the only physical evidence
that the State produced in this case, appellant disregards the fact that a .38-caliber
bullet was recovered from Gutierrez’s body and that this bullet also connected him
to the crime. Dickey testified that he had traded appellant a silver .380-caliber
firearm for a .38-caliber revolver and a .22-caliber pistol. Lewis testified that he had
seen appellant carry a chrome .380-caliber semiautomatic weapon. Dickey also
testified that appellant’s accomplice stole the handguns not long after the trade.
          “[W]e cannot conclude that a conviction is ‘clearly wrong’ or ‘manifestly
unjust’ simply because, on the quantum of evidence admitted, we would have voted
to acquit had we been on the jury.” Watson, 204 S.W.3d at 417. “[W]e cannot
declare that a conflict in the evidence justifies a new trial simply because we disagree
with the jury’s resolution of that conflict.” Id. “Before finding that evidence is
factually insufficient to support a verdict . . . , we must be able to say, with some
objective basis in the record, that the great weight and preponderance of the evidence
contradicts the jury’s verdict.” Id. Viewing the evidence in a neutral light, the jury
rationally could have determined that appellant left his fingerprints on Gutierrez’s car
at the time that the murder occurred or immediately before or after the murder was
committed; the bullet that killed Gutierrez came from a .38-caliber handgun;
appellant traded a .38-caliber handgun for another gun; and the .38-caliber handgun
was later stolen back by appellant’s accomplice. 
          3.       Witnesses’ Recanting of Statements
          Appellant asserts in his third contention that all but one of the witnesses
recanted statements that they made to police investigators. However, of the several
State’s witnesses who testified at trial, only two denied the truth of the statements that
they had made to police. Morever, neither of these two witnesses recanted his entire
statement, but only the specific details that directly implicated appellant. Two
persons who knew appellant well, Patton and Lewis, testified that appellant had told
them that he had committed the murder. One of appellant’s friends, Ike,
acknowledged that he had made statements to police that appellant had told him that
he had killed a woman at the Chase Bank on Bellfort. When questioned at trial as to
what appellant had said, Ike did not deny that he had made a statement to police that
appellant had admitted killing a lady. In fact, Ike reiterated that the entire statement
that he had made to police was true, with the exception that the accomplice, rather
than appellant, had actually shot Gutierrez. Appellant’s accomplice is now deceased,
and Ike and appellant have been long-time friends.
 
          Although Dickey testified at trial that he had been intoxicated when
interviewed by police, he admitted that he had traded a .380-caliber gun for two guns
brought to him by a person named Red. He further testified that the guns were later
stolen by appellant’s accomplice. The only part of the story that he gave investigators
that Dickey changed during his trial testimony was that “Red” was not “Little Red”
and that he had mistakenly identified appellant from a photograph. 
          The fact-finder alone determines what weight to place on contradictory
testimonial evidence because that determination depends on the fact-finder’s
evaluation of credibility and demeanor. Cain, 958 S.W.2d at 408–09. Viewing the
evidence in a neutral light, the jury, as exclusive judge of the credibility of witnesses,
rationally could have found that, consistent with Ike’s prior statement, as opposed to
his later testimony, appellant invited Ike to participate in a robbery at a Chase Bank
on Bellfort; appellant admitted the day after the murder had occurred to having shot
and possibly killed a lady; appellant admitted to having run into the woods and
having hidden the guns used in the murder; and appellant later retrieved the guns and
traded them. Furthermore, the jury rationally could have disbelieved Dickey’s trial
testimony and believed his prior statement that appellant had possessed the .38-caliber handgun consistent with the one used to murder Gutierrez and that same
handgun was stolen back by appellant’s accomplice. 
          4.       Improper Police Conduct
          In his fourth contention, appellant argues that the testimony of Lewis is
doubtful because he had been “roughed up” at the police station where he was
interviewed and because the police had yelled at him. Lewis testified at trial that an
officer had grabbed him by the collar, had shaken him against the wall, and had said,
“I’m tired of y’all.” Although such treatment, if it occurred, is not to be condoned,
nearly seven years had elapsed from the incident to the date on which Lewis testified. 
Additionally, Lewis confirmed at trial that the information that he had given to
investigators in that interview seven years before had been correct, and he verified
under oath that appellant had admitted to having committed the murder. There was
no indication in Lewis’s testimony that any alleged mistreatment by police officers
affected the veracity of his statements to police or his testimony at trial. For these
reasons, the jury may well have disbelieved that Lewis was mistreated or,
alternatively, it may have nonetheless found that appellant admitted to Lewis that he
had shot a woman and probably killed her during a robbery attempt at an ATM on
Bellfort; appellant had hidden the guns that had been used in the woods and had later
retrieved them with Ike; and he had carried a firearm that he had traded for the
weapon used to murder Gutierrez.
 
          5.       Credibility of Witness
          Finally, in his fifth argument, appellant contends that Patton’s testimony was
tainted by the fact that he expected to receive favorable treatment affecting his
incarceration. Appellant further contends that Patton’s testimony was not credible
because he had been convicted of a first-degree offense. Patton conceded that his
bond was reduced after having given investigators incriminating information about
appellant. He also expressed an expectation that his cooperation in this case might
be viewed favorably by the sentencing court and in subsequent parole hearings,
thereby affecting a reduction in his sentence. The jury was made aware of these
circumstances, however. Therefore, whether to believe Patton was a credibility
determination. It would thus not be wholly unreasonable, given the weight of all the
evidence, and viewed in a neutral light, that a jury could have found that appellant
had admitted to Patton just days after the murder that appellant had shot Gutierrez,
had hidden the gun used to shoot her, and had later traded it. 
E.      Conclusion
          In summary, the State showed that, just prior to the murder, appellant planned
a robbery at the very location at which the murder occurred. A witness heard a
gunshot and saw a man, whom he believed was light-complected, flee with another
man, whom he believed was dark-complected, from the very place where Gutierrez 
was murdered. A second witness picked up two men matching the description of
appellant and his accomplice, one dark and one light-complected, from the area in
which the murder had taken place. Furthermore, that witness noticed that appellant
appeared to hide when they passed the crime scene as it was being investigated by
police. Three of appellant’s friends told authorities that appellant had admitted to
shooting a woman. Two of appellant’s friends also reported that appellant had had
a gun in his possession that a ballistics expert verified was the type of gun used in the
shooting. Lastly, appellant’s fingerprints were found on Gutierrez’s car at the scene
of the crime. 
          Upon comparison of the overall weight of the incriminating evidence with the
evidence that would refute it, we conclude that any rational trier of fact could have
found beyond a reasonable doubt that appellant attempted to rob Gutierrez and,
during that attempt, pointed a dangerous weapon at her, fired that weapon, and killed
her.
          We overrule appellant’s second issue.
Motion for Mistrial
          In appellant’s third issue, he asserts that the trial court committed reversible
error by denying his motion for mistrial during the State’s closing argument, when
the prosecutor referred to what appellant contends was his post-arrest silence.


 
            During his closing argument at the first stage of the trial, the prosecutor said
to the jury, “Why won’t the defendant talk to Straughter? Straughter calls him up,
Hey, we want to talk with you about a capital murder. You’re not guilty. Yeah, I’ll
talk with you. Why won’t he talk with Straughter.” Appellant objected to the line of
argument as commenting on his right to remain silent. The objection was sustained. 
Appellant asked that the jury be instructed to disregard, and the jury was so
instructed. Appellant then moved for mistrial, but his motion was denied. The
prosecutor then inquired, “Judge, just so we’re clear on the record, somebody who is
not in custody confronted by a police officer . . . .” Appellant again objected to the
argument. The objection was sustained, and the State was ordered to proceed.
Appellant did not renew a motion for mistrial. 
          As shown above, appellant’s trial objection (comment on his right to remain
silent) does not comport with his complaint on appeal (comment on his post-arrest
silence). Accordingly, nothing is presented for review. See, e.g., Swain v. State, 181
S.W.3d 359, 367 (Tex. Crim. App. 2005) (holding that nothing is presented for
review when complaint on appeal fails to comport with trial objection).
          We overrule appellant’s third issue.
 Denial of Objections to State’s Closing Arguments at Punishment
          In his fourth issue, appellant asserts that the trial court erred by denying his
objections to four portions of the State’s closing argument at the punishment phase. 
Appellant argues that in those portions of the closing argument, the prosecutor, in
essence, “accused the jury of being made up of lawbreakers,” arguing that the
comments were condescending and tended to bully the jury into assessing a life
sentence by insinuating that its finding of the lesser charge of felony murder was
unjust. Appellant asserts that the court, by placing a “stamp of judicial approval” on
the prosecutor’s improper tactics, magnified the possibility of harm that may have led
to a life sentence that was not otherwise assured. See Good v. State, 723 S.W.2d 734,
738 (Tex. Crim. App. 1986). 
A.      Standard of Review
          A prosecutor may argue his opinions concerning issues in the case so long as
the opinions are based on the evidence in the record and do not constitute unsworn
testimony. McKay v. State, 707 S.W.2d 23, 37 (Tex. Crim. App. 1985); Mims v.
State, No. 12-02-00178-CR, 2004 WL 949453, at *15 (Tex. App.—Tyler 2004, pet.
ref’d) (mem. op.). The contested jury argument must be extreme or manifestly
improper to constitute reversible error. Sandoval v. State, 52 S.W.3d 851, 857 (Tex.
App.—Houston [1st Dist.] 2001, pet. ref’d). “In general, proper jury argument
encompasses one of the following: (1) summation of the evidence presented at trial;
(2) reasonable deduction drawn from that evidence; (3) answers to the opposing
counsel’s argument; and (4) pleas for law enforcement.” Id.; Guidry v. State, 9
S.W.3d 133, 154 (Tex. Crim. App. 1999). In most cases, if error occurs, an
instruction to disregard will cure any error committed. Shannon v. State, 942 S.W.2d
591, 597 (Tex. Crim. App. 1996); Cole v. State, 194 S.W.3d 538, 544 (Tex.
App.—Houston [1st Dist.] 2006, pet. ref’d).
B.      Complained-of Arguments, Appellant’s Objections, and Court’s Rulings
          Appellant complains of four portions of the prosecutor’s closing argument.
          1.       The First
State:The first thing I want to do officially and on the record is
extend my sincere apology to the Gutierrez family. Tammy
and I obviously made some serious mistakes in either
presenting the evidence, choosing the composition of the
jury. Those good and decent people have suffered so much
they will never have justice in this case. You know, folks, 
unlike you I am not under oath but I told you the God’s
truth last Thursday when I told you that the fight for justice
is only won in the jury room and it was lost last Thursday. 
Since we had such a strong case, I didn’t feel there was
need to tell you that the opposite is true, the fight for
justice can be forever lost in the jury room. When jurors
promise us to follow one set of laws and choose to follow
another set of laws, there is no justice. Apparently, there
is at least one man or woman, perhaps more, I doubt it, in
the jury room who has an agenda, wants to change the law
in the jury room. That is wrong. In voir dire—
 
Appellant:Judge, I am going to object to this line of argument as
being totally inappropriate.
 
Court:Sustained.
Appellant:And I ask the jury to please disregard—
Court:Disregard the last comment by the prosecutor. Ladies and
gentlemen, you are so instructed.
 
          2.       The Second
State:In voir dire Tammy told you that all we had to prove was
an intentional murder. Premeditation, preplanning does not
now nor has ever been part of the capital murder laws or
any laws in the State of Texas. If somebody told you that,
they sold you a bill of goods. It is wrong. It is totally and
completely false. Folks. If there is somebody among you,
and I mean this sincerely, who doesn’t think a juvenile
should be prosecuted in adult court, contact your
legislature, lobby in Austin, get it changed. You told us I
will follow that law. If somebody thinks in order for
someone to be found guilty of premeditation, intentional
isn’t enough, I need premeditation, contact your legislature,
lobby in Austin. The jury room is not the place to change
our laws. If a witness takes an oath and they [sic] don’t
follow their [sic] oath, Tammy [and] I can deal with that. 
We can impeach them [sic] with their [sic] prior
statements. We can call other witnesses. We can provide
physical evidence. But, folks, when you tell us, yeah, I
will follow the law and then go back there and don’t follow
the law, what in the world are we to do? How can good
people like that—
 
Appellant:Judge, again, I am going to object to this line of argument.
Court:It is overruled.
 
          3.       The Third
State:I want you to think about something and think about
something very seriously because it is true, not just because
I’m frustrated, not because I am angry but it is true. We
live in a very dangerous, very random, very violent society. 
Do not be so naive to think in a split second, maybe even
as we are talking, events could unfold that would put you
in those chairs. No victim’s family ever deserves a jury
that always finds somebody guilty, that would always
assess a maximum sentence but the victims’ families
deserve people who follow their oath and not change the
law. As to the other folks on the jury without agendas,
folks, I know it is frustrating to serve as a juror. I know
we’ve wasted a lot of your time. Tammy and I are just as
frustrated as you. We don’t run the court but when good
people stand silent while people violate the law, injustice
occurs which is just what happened.
 
Appellant:Judge, again I’m going to object to his opinion that an
injustice has occurred. This is opinion testimony and is
improper argument.
 
Court:Sustained as to the last comment.
          4.       The Fourth
 
State:Since we are now forced to conduct a punishment hearing,
folks, your interests are aligned with mine. It [sic] is going
to get out one day. It could be a long time, could be a short
time. The choice is yours. It is self-protection at this point
for you, your spouses, your girlfriends, your kids, your
grandkids, your families, your friends—
 
Appellant:Judge, I object to this line of argument as impersonalizing
[sic] the jury, [it] is improper.
 
Court:It is overruled.
C.      Waiver
          We hold that appellant preserved his challenge to none of the four complained-of arguments.
          As for the first argument, appellant’s objection was sustained, and the jury was
instructed to disregard the argument. To complain of an improper jury argument, a
defendant must generally object to the argument and pursue his objection to an
adverse ruling. Cockrell v. State, 933 S.W.2d 73, 89 (Tex. Crim. App. 1996);
Washington v. State, 127 S.W.3d 111, 115 (Tex. App.—Houston [1st Dist.] 2003, no
pet.). For example, if the trial court sustains the objection, the defendant must request
an instruction to disregard; if that request is granted, the defendant must move for a
mistrial. Cook v. State, 858 S.W.2d 467, 473 (Tex. Crim. App. 1993); Washington,
127 S.W.3d at 115–16. Because appellant received a favorable ruling on his first
objection and an instruction to disregard and did not move for mistrial, he has waived
his complaint based on the prosecutor’s first argument.
 
          Regarding the second argument, appellant’s objection was only general. “A
general or imprecise objection may be sufficient to preserve error for appeal, but only
if the legal basis for the objection is obvious to the court and to opposing counsel.” 
Buchanan v. State, 207 S.W.3d 772, 775 (Tex. Crim. App. 2006) (emphasis in
original). “When the objection is not specific, and the legal basis is not obvious, it
does not serve the purpose of the contemporaneous-objection rule for an appellate
court to reach the merits of a forfeitable issue that is essentially raised for the first
time on appeal.” Id. (emphasis in original). Although appellant used the term
“again” in making this general objection, his only prior objection had not specified
grounds (except to say that the argument was “totally inappropriate”), even though
the trial court sustained it. Under these circumstances, and in context of the objected-to argument, we decline to hold that the ground of appellant’s second objection was
so obvious that he was exempted from the normal requirement of specifying his
complaint so that the trial court could understand its basis before ruling. Appellant
has thus waived his challenge based on the second prosecutorial argument.
          Appellant’s objection to the third argument was sustained, and he requested
neither an instruction to disregard nor a mistrial. He has thus waived his challenge
based on the third prosecutorial argument. See Cook, 858 S.W.2d at 473.
 
          Appellant did obtain an adverse ruling on his objection to the fourth argument,
but his objection below does not comport with that on appeal. Below, he complained
that the prosecutor’s argument “impersonalized [sic] the jury”; on appeal, he
complains that the prosecutor’s argument bullied the jury into assessing a life
sentence. No error is generally preserved when an appellate complaint does not
comport with the trial objection. Swain, 181 S.W.3d at 367.
          None of the four arguments on which appellant bases his appellate complaint
was preserved. Accordingly, we overrule appellant’s fourth issue.Conclusion
          We affirm the judgment of the trial court. 
 
                                                                        Tim Taft
     Justice

Panel consists of Justices Taft, Hanks, and Higley.

Do not publish. Tex. R. App. P. 47.2(b).