**Opinion issued July 2, 2013**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-12-00550-CR

————————————

**QUENTIN JEROME BELL, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

---

**On Appeal from the 338th District Court**
**Harris County, Texas**
**Trial Court Case No. 1294745**

---

### MEMORANDUM OPINION

A jury convicted Quentin Jerome Bell of murder and assessed punishment at

twenty-one years' confinement.[1] In a single issue, Bell contends that the trial court

---

[1]    *See* TEX. PENAL CODE ANN. § 19.02 (West 2011)

erred in overruling his objection to improper jury argument during the punishment phase of trial. We affirm.

## Background

In February 2011, Bell shot and killed Willis Petty, who was dating Bell's former girlfriend, La Kimberly Tennell. Tennell and Bell testified that, at the time of the shooting, they had been separated for several months, although Bell lived at Tennell's house until several days before the shooting. Bell remained at Tennell's house to help her financially and with the care of their three children. They had agreed that neither would have overnight guests of the opposite sex when their children were present.

On the morning of February 5, Bell learned that Petty had spent the previous night with Tennell and the children. Bell testified that he felt betrayed and became increasingly angry and resentful throughout the day. He decided that since Tennell did not keep their agreement about overnight guests, he would not keep a separate agreement that allowed her to keep a television and a bed frame. When Bell asked Tennell to return the two items, she refused. According to Tennell, Bell claimed their son as a dependent for income tax purposes, and Bell was to have "all that money" to get what he needed for his apartment. If he took the television and bed frame, she wanted some of "that money" in return.

Approximately forty-five minutes before the shooting, Bell sent Tennell a text message about the television and bed frame. In following text messages, he threatened to kill Petty if he caught "him slipping." In one of her text messages, Tennell responded that "you better watch your back. He said he saw you riding through too. He got you." Tennell testified that she did not take any of Bell's text messages seriously because he was "talking" as he normally talked and was talking out of anger. Approximately five minutes before the shooting, Bell sent Tennell two text messages—"It's going to be too easy to get him," and "Yeah, I got him." Tennell responded "You passing by, huh?" Five minutes later, Tennell called 911 to report that Petty had been shot.

At trial, Bell did not dispute that he shot Petty. Bell's and Tennell's versions of the shooting, however, differ. Bell, a car service driver, testified that he was between airport trips when he drove to a friend's house on Tennell's street to borrow a truck. His friend was not home. Bell then went to Tennell's house to get the television. He testified that he did not know that Petty was at the house. When Bell got out of his car, Petty, who was in the driveway, ran toward him. Bell testified that he pulled his gun from his pocket, where he usually carried it when alone in the car, in response to Petty's confrontation. Bell told Petty that he was there to get his belongings because Tennell broke the agreement about overnight guests, and that Tennell and he (Bell) had slept together the previous month.

3

According to Bell, Petty said "let's go see what she's going to say." Petty and Bell walked toward the house; however, Tennell closed and locked the door after Petty went in. Bell remained outside. Through a window, he saw Tennell and Petty argue and saw Petty hit Tennell across the face. Tennell fell to the ground and crawled into the bedroom. Petty then unlocked the door and let Bell into the house. Bell followed Petty into the bedroom where Tennell was sitting on the bed and crying.

According to Bell, Petty "just kept asking her was you still sleeping with this man." When Tennell did not answer, "he walked up to her and he raised her—his hand about getting ready to hit her. I told him you don't have to do that." Petty then turned and came toward Bell as if to take his gun. Bell testified that he got scared and shot Petty. He was not aware how many times he shot Petty; his mind went blank; he was terrified; he was not deliberating on what he was doing while pulling the trigger; he was "[j]ust pulling it." Bell immediately asked Tennell what he should do to help Petty and, at her request, got towels from a bathroom. When he asked her again what she wanted him to do, she answered "just leave, just leave."

Tennell told an entirely different version of events. She testified that Petty was outside her house washing her car that afternoon while she was inside in a bedroom. A short time later, Petty came into the house and told Tennell that Bell was in the driveway with a gun. Tennell tried to stop Petty from returning outside,

4

he pushed her away, she fell to the floor, and Petty went back outside. She went into the bedroom to call the police because she did not "want them to be going back and forth." A few seconds later, Petty returned, holding his side, and said, "Baby, he shot me." Bell then walked into the house, fired his gun at Petty as he ran toward Tennell, and continued firing until the gun was empty. Tennell called 911. While she talked with the 911 operator, Bell got towels to help Petty. He said that "he was sorry. He knew he messed up. He snapped. He just left." Petty died after being shot five times, once in the chest and four times in his back or the back of his arms. Tennell testified that on the day of the shooting she did not discuss with Petty whether she had slept with Bell.

After Tennell called 911, phone records show that Bell called Tennell several times, but she did not answer. Approximately thirty minutes after leaving Tennell's house, he called 911 to turn himself in. Later that night, Bell went to his apartment, changed his clothes, went with his mother to the police station, and turned himself and the gun into the police. He told the officer that he shot his ex-girlfriend's boyfriend and that the shooting was an accident. He later took the clothes that he wore the day of the shooting to the police.

The jury found Bell guilty of murder. The charge did not include an instruction on self-defense.

At the punishment phase, the State presented two witnesses, Petty's sister and his children's mother. Bell presented six witnesses, including family members and his employer. The punishment-phase charge included a special issue on sudden passion. During closing argument, Bell objected to the State's comment that "they don't get sudden passion under the defendant's version of the facts," noting that "in that case that would be self-defense." The trial court overruled the objection.

At the close of the punishment phase, the jury returned a negative finding on sudden passion. This appeal followed.

## Punishment-Phase Closing Argument

In his single issue, Bell contends that the trial court erred in overruling his objection that the State misstated the law on sudden passion in its closing argument during the punishment phase of the trial.

### A.     Standard of review

The law requires a fair trial, free from improper argument by the State. *Long v. State*, 823 S.W.2d 259, 267 (Tex. Crim. App. 1991). Proper jury argument generally must encompass one of the following general areas: (1) a summation of the evidence presented at trial, (2) a reasonable deduction drawn from that evidence, (3) an answer to the opposing counsel's argument, or (4) a plea for law enforcement. *Guidry v. State,* 9 S.W.3d 133, 154 (Tex. Crim. App. 1999); *Sandoval v. State,* 52 S.W.3d 851, 857 (Tex. App.—Houston [1st Dist.] 2001, pet.

ref'd). To determine whether a jury argument properly falls within one of these categories, we consider the argument in light of the entire record. *Sandoval,* 52 S.W.3d at 857. Jury argument that misstates the law or is contrary to the jury charge is improper. *Whiting v. State*, 797 S.W.2d 45, 48 (Tex. Crim. App. 1990); *Thomas v. State*, 336 S.W.3d 703, 713 (Tex. App.—Houston [1st Dist.] 2010, pet. ref'd).

We review the trial court's ruling on an objection to closing argument for an abuse of discretion. *See Davis v. State*, 329 S.W.3d 798, 825 (Tex. Crim. App. 2010); *Cantu v. State*, 395 S.W.3d 202, 209 (Tex. App.—Houston [1st Dist.] 2012, pet. ref'd); *Cole v. State*, 194 S.W.3d 538, 545–46 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). To constitute an abuse of discretion, the trial court's ruling must fall outside the zone of reasonable disagreement. *See Wead v. State*, 129 S.W.3d 126, 129 (Tex. Crim. App. 2004). Even when an argument exceeds permissible bounds, the argument does not constitute reversible error unless, in light of the record as a whole, the argument is extreme, manifestly improper, violative of a mandatory statute, or injects new facts harmful to the accused into the trial proceeding. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000).

## B.    The State's argument on sudden passion

Bell contends that the State misstated the law on sudden passion when the prosecutor stated:

7

> Now, if you think about the testimony, first of all, they don't get sudden passion under the defendant's version of the facts because when the defendant testified, he testified that he shot Mr. Petty when Mr. Petty was coming at him. He thought he was going to get the gun from him or assault him. Folks, in that case that would be self-defense.

According to Bell, the prosecutor misstated the law because she "in effect" argued that an affirmative finding on the issue of sudden passion was precluded by the jury's rejection of Bell's testimony that he acted in self-defense. In other words, the prosecutor erroneously informed the jury that Bell's testimony that portrayed the shooting as a case of self-defense precluded his reliance on the law of sudden passion at the punishment phase. The State responds that it did not argue that a defendant who presents evidence of self-defense is precluded from obtaining a sudden-passion finding. Rather, the State argued that "the defendant's version of the facts" did not support an affirmative finding of sudden passion, although that evidence may have raised an issue of self-defense.

A defendant convicted of murder may argue at the punishment phase that he caused the death "under the immediate influence of sudden passion arising from an adequate cause." TEX. PENAL CODE ANN. § 19.02(d) (West 2011); *see Hernandez v. State*, 127 S.W.3d 206, 210–11 (Tex. App.—Houston [1st Dist.] 2003, pet. ref'd). The defendant has the burden to prove sudden passion by a preponderance of the evidence. TEX. PENAL CODE ANN. § 19.02(d) (West 2011). A finding of sudden passion reduces the offense from a first degree to a second degree felony,

8

and the maximum sentence from life to twenty years. *See id.* at §§ 12.32 (providing punishment for first-degree felony at confinement of five years to life); 12.33 (providing punishment for second-degree felony at confinement of two to twenty years); 19.02(d) (providing that if defendant proves sudden passion offense is second-degree felony).

The theories of sudden passion and self-defense may arise out of the same facts. Evidence of self-defense generally raises the issue of sudden passion. "It would be 'a rare instance' when issues of self-defense do not also raise issues of sudden passion." *Benavides v. State*, 992 S.W.2d 511, 525 (Tex. App.—Houston [1st Dist.] 1999, pet. ref'd). The converse is also true—"except in rare instances, when the State's evidence is sufficient to overcome a claim of self-defense, it will also be sufficient to show the absence of sudden passion." *Id*. A jury's rejection of self-defense at the guilt-innocence phase, however, does not preclude submission of a sudden passion issue at the punishment phase. *See Trevino v. State*, 100 S.W.3d 232, 242–43 (Tex. Crim. App. 2003) (stating that "jury's rejection of self-defense at guilt-innocence does not necessarily mean that, given an instruction on sudden passion at punishment, it would have rejected that theory as well").[2]

---

[2] The Court of Criminal Appeals recently confirmed that, in *Trevino v. State*, the Court "did not discount the possibility that '[t]he evidence in a case in which a jury rejected a claim of self-defense could demonstrate also that the appellant was not harmed by the failure to receive a sudden passion charge[.]'" *Wooten v. State*,

Bell relies on *Trevino* and *Chavez v. State*, 6 S.W.3d 66 (Tex. App.—San Antonio 1999, pet. ref'd), to support his argument that the State misstated the law. *Trevino* and *Chavez* address submission of an issue or instruction on sudden passion and recognize that a jury's rejection of a defendant's claim of self-defense at the guilt-innocence phase does not automatically deprive the defendant of a sudden passion instruction at the punishment phase. *See Trevino*, 100 S.W.3d at 243 (concluding that omission of sudden passion instruction from punishment-phase jury charge was harmful although jury rejected self-defense at guilt-innocence phase); *Chavez*, 6 S.W.3d at 72–73 (citing *Benavides,* 992 S.W.2d at 524–25) (concluding that failure to request sudden passion instruction was not ineffective assistance of counsel because it was reasonable to presume that evidence justifying adverse jury finding on self-defense would justify finding that defendant was not acting under sudden passion).

In this case, the punishment-phase jury charge included a special issue on sudden passion. The jury was asked:

> Do you the Jury unanimously find by a preponderance of the evidence that the defendant caused the death of Willis Petty under the immediate influence of sudden passion arising from an adequate cause?

---

No. PD-1437-12, 2013 WL 2493973, at *5 (Tex. Crim. App. June 12, 2013) (quoting *Trevino v. State*, 100 S.W.3d 232, 242 (Tex. Crim. App. 2003)).

The charge defined "sudden passion" and "adequate cause" as those terms are defined in the Penal Code.[3] "Sudden passion" is "passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation." TEX. PENAL CODE ANN. § 19.02(a)(2). "Adequate cause" is "cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." *Id.* at § 19.02(a)(1); *see McKinney v. State,* 179 S.W.3d 565, 569 (Tex. Crim. App. 2005) (stating that to prove sudden passion defendant must prove that "homicide occurred while the passion still existed and before there was reasonable opportunity for the passion to cool; and that there was a causal connection between the provocation, the passion and the homicide").

During its closing argument, the State addressed the issue of sudden passion in the jury charge, tracking the issue and definitions included in the charge:

> In your jury charge, there's an instruction on sudden passion. You have to determine whether or not the defendant caused the death under the immediate influence of sudden passion arising from adequate cause.
>
> The law defines adequate cause. It's cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of

---

[3] A note sent by the jury during its deliberation indicates the jury considered the sudden passion issue. The jury asked whether "the wording 'another acting with the person killed' means acting with the knowledge of the person killed?' under sudden passion." The trial court referred the jury to the charge.

11

ordinary temper sufficient to render the mind incapable of cool reflection.

Sudden passion is defined as passion directly caused by and arising out of provocation by the individual that was killed or another acting with the person that was killed which passion arises at the time of the offense and is not solely the result of former provocation.

Folks, the issue of sudden passion is the defendant's burden. . . . Folks, I submit to you that they haven't met that burden.

Now, if you think about the testimony, first of all, they don't get sudden passion under the defendant's version of the facts because when the defendant testified, he testified that he shot Mr. Petty when Mr. Petty was coming at him. He thought he was going to get the gun from him or assault him. Folks, in that case that would be self-defense.

Bell's counsel objected, stating that "[t]here's no disparity between self-defense and acting in sudden passion. One does not exclude the other. They are frequently coming out of the same incident and it's common to have both allegations." The trial court overruled the objection.

We conclude that the prosecutor did not misstate the law on sudden passion. The prosecutor did not argue, as Bell contends, that the jury's rejection of Bell's "testimony that he was acting in self-defense" precluded an affirmative finding on sudden passion. First, Bell does not explain how the jury could have rejected self-defense when the guilt-innocence charge did not contain a self-defense

12

instruction. Second, the prosecutor argued that Bell's testimony did not demonstrate sudden passion, although it may have demonstrated self-defense.[4]

The purpose of closing argument is to assimilate the evidence to assist the factfinder in drawing proper conclusions from the evidence. *Graves v. State*, 176 S.W.3d 422, 431 (Tex. App.—Houston [1st Dist.] 2004, pet. stricken) (citing *Gaddis v. State*, 753 S.W.2d 396, 398 (Tex. Crim. App. 1988)). During the State's argument, the prosecutor may make reasonable deductions from the evidence. *See Cantu v. State,* 939 S.W.2d 627, 633 (Tex. Crim. App. 1997) (noting that, during argument, parties are "allowed wide latitude in drawing inferences from the evidence so long as the inferences drawn are reasonable and offered in good faith"); *see also Muhammad v. State*, No. 08-06-00182-CR, 2008 WL 1976732, at *2 (Tex. App.—El Paso 2008, no pet.) (not designated for publication) (concluding that State's argument that evidence was inconsistent with defendant's assertion that he shot victim under influence of sudden passion was proper jury argument). The State's remarks to which Bell objected were an argument that the evidence did not

---

[4] The Penal Code provides that "a person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force." TEX. PENAL CODE ANN. § 9.31(a) (West 2011). Deadly force in self-defense is justified when a person reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful deadly force or to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery. *Smith v. State*, 355 S.W.3d 138, 145 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (citing TEX. PENAL CODE ANN. § 9.32 (West 2011).

13

show sudden passion. The remarks were a reasonable deduction from the evidence and a summation of that evidence.

The State argued that Bell did not meet his burden to establish sudden passion. The prosecutor began her argument stating the definitions of "sudden passion" and "adequate cause" included in the charge and informing the jury that Bell had the burden to prove sudden passion. After the trial court overruled Bell's objection, the prosecutor clarified the State's argument, stating that "[u]nder the defendant's version of the facts, it's not sudden passion. It's not sudden passion either under Kim Tennell's version of the facts." The prosecutor concluded the State's argument by asking the jury to find that Bell had not proven that he acted in sudden passion. In his argument, Bell's counsel argued that "[s]elf-defense and sudden passion are not mutually exclusive at law. . . . People can act in both manners, and you wouldn't have this charge on sudden passion if they were mutually exclusive." In its rebuttal, the State again argued that the evidence did not show sudden passion.

We conclude that the State's remarks that Bell's testimony showed self-defense and not sudden passion did not misstate the law of sudden passion. The trial court's overruling Bell's objection was not outside the zone of reasonable disagreement and, thus, the trial court did not abuse its discretion. We overrule Bell's issue on appeal.

## Conclusion

Having overruled Bell's single issue, we affirm the trial court's judgment.

Harvey Brown
Justice

Panel consists of Justices Jennings, Brown, and Huddle.

Do not publish. TEX. R. APP. P. 47.2(b).